**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ABDULLAH ANSARY, derivatively on behalf of TABLEAU SOFTWARE, INC. and SALESFORCE.COM, INC., | C.A. No. _____ |
| Plaintiff, | |
| vs. | **DEMAND FOR JURY TRIAL** |
| CHRISTIAN CHABOT, THOMAS E. WALKER JR., PATRICK HANRAHAN, CHRISTOPHER STOLTE, FRANCOIS AJENSTAT, FOREST BASKETT, WILLIAM "BILLY" BOSWORTH, ELLIOTT "REN" JURGENSEN JR., JOHN MCADAM, JAY PEIR, and BROOKE SEAWELL, | |
| Defendants, | |
| and | |
| TABLEAU SOFTWARE, INC. and SALESFORCE.COM, INC., | |
| Nominal Defendants. | |

**VERIFIED SHAREHOLDER DOUBLE DERIVATIVE COMPLAINT**

**INTRODUCTION**

Plaintiff Abdullah Ansary ("Plaintiff"), by his undersigned attorneys, derivatively and on behalf of Nominal Defendants Tableau Software, Inc. ("Tableau" or the "Company") and Salesforce.com, Inc. ("Salesforce"), files this Verified Shareholder Double Derivative Complaint against Individual Defendants Christian Chabot, Thomas E. Walker Jr., Patrick Hanrahan, Christopher Stolte, Francois Ajenstat, Forest Baskett, William "Billy" Bosworth, Elliott "Ren" Jurgensen Jr., John McAdam, Jay Peir, and Brooke Seawell (collectively, the "Individual Defendants" and together with Tableau and Salesforce, the "Defendants") for breaches of their

1

fiduciary duties as directors and/or officers of Tableau and unjust enrichment. As for his complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tableau and Salesforce, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder double derivative action that seeks to remedy wrongdoing committed by Tableau's directors and officers starting on February 5, 2015 and continuing through February 4, 2016 (the "Relevant Period").

2.      The double derivative claims asserted in this Complaint are the claims that belong to Tableau, which is the wholly-owned subsidiary of Salesforce, and, thus, are the claims that ultimately belong to Salesforce.

3.      Salesforce is a cloud-based software company that offers a suite of technologies and services related to customer relationship management. The Company was founded in 2003 by Defendants Christian Chabot, Patrick Hanrahan, and Christopher Stolte with a mission to make data understandable to ordinary people. Tableau also provides business analytics (sometimes referred to as business informatics, or "BI") software products. Tableau's main products include: Tableau Desktop, Tableau Server, Tableau Online, Tableau Prep, and Tableau Public. The

Company's technology includes Tableau's "proprietary and breakthrough technology called VizQL."

4.      Although the Company enjoyed relatively minimal competition in its early years, by 2015, a number of competing products entered the marketplace, many offered by sophisticated companies with substantial resources, including Salesforce.

5.      During the Relevant Period, the Individual Defendants made, and caused Tableau to make, numerous false statements regarding the effect that competition was having on Tableau's business and operations in press releases, SEC filings, during conference calls, and at presentations to investors.

6.      After misleading the market about the effects of competition on Tableau's business for roughly a year, the Company issued a press release on February 4, 2016, revealing that it had recognized a $46.7 million valuation allowance on deferred income tax assets, explaining that "[w]e believe that it is more likely than not that the benefit from our U.S. federal and state deferred tax assets will not be realized." This disclosure signaled to the marketplace that competitors' aggressively priced offerings were having a material adverse effect on Tableau's business.

7.      On this news, the price of Tableau stock dropped $40.42 per share, or 49.4%, from the previous day's closing price of $81.75, to close at $41.33 per share on February 5, 2016.

8.      During the Relevant Period, the Individual Defendants personally made and/or caused the Company to make a series of materially false and misleading statements regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) new, aggressively-priced software introduced by competitors was causing Tableau's customers to delay and cancel pending

license orders; (2) competitive products were lengthening Tableau's sales cycle and decelerating its growth rate; (3) statements about competition having little or no adverse effect on the Company's business understated and misrepresented the effects of competition on Tableau; (4) based on the foregoing, the Individual Defendants lacked a reasonable basis for positive statements about the Company's future growth prospects; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

9.      Also during the Relevant Period, the Individual Defendants breached their fiduciary duties by causing the Company to fail to maintain internal controls.

10.      Furthermore, when the Company's stock price was artificially inflated due to the foregoing misrepresentations, seven of the Individual Defendants breached their fiduciary duties by engaging in lucrative insider sales, netting proceeds of over 337 million.

11.      In light of the Individual Defendants' misconduct, which has subjected Tableau and its former Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO"), its former Chief Development Officer, and its former Chief Scientist to being named as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Southern District of New York, captioned *Scheufele, et al. v. Tableau Software, Inc., et al.*, C.A. No. 17-cv-05753-JGK (the "Securities Class Action"), [1] the need to undertake internal investigations, and losses due to the unjust enrichment of the Individual Defendants who were

---

[1] On February 2, 2018, the Second Amended Complaint for Violations of the Federal Securities Laws ("SAC") was filed in the Securities Class Action.  On February 8, 2019, Judge John G. Koeltl entered an order denying the motion to dismiss the SAC. On January 16, 2020, Judge Koeltl granted the lead plaintiff's motion for class certification in the Securities Class Action.

improperly over-compensated by the Company and who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

12.     The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

13.     On June 9, 2019, Tableau entered into an agreement and plan of merger (the "Merger Agreement") with Salesforce and Sausalito Acquisition Corp., a Delaware corporation and wholly-owned subsidiary of Salesforce. Pursuant to the Merger Agreement, Salesforce acquired all outstanding shares of Tableau stock, which were exchanged for shares of Salesforce stock. Salesforce's acquisition of Tableau, a deal worth $15.7 billion, was completed on August 1, 2019, on which date Salesforce acquired all of the outstanding capital stock of Tableau, and Tableau became an indirect wholly-owned subsidiary of Salesforce (collectively, the "Merger"). Subsequently, Tableau's stock ceased trading on the New York Stock Exchange ("NYSE").

14.     In connection with the Merger, on August 1, 2019, each member of Tableau's Board of Directors ("Board") resigned, with the exception of non-party Adam Selipsky ("Selipsky"), who stayed on as the CEO of Tableau.

15.     Because of the substantial damage the Individual Defendants inflicted on Tableau, the Board of Directors of Salesforce (the "Parent Board") caused Salesforce to acquire Tableau at an unfair price. Moreover, the Parent Board caused Salesforce to include an indemnification provision in the Merger Agreement immunizing all of the Individual Defendants from liability, which is patently unreasonable given the Individual Defendants' breaches of fiduciary duty and other misconduct as alleged herein. As such, a majority of the Parent Board cannot consider a demand to commence litigation against the Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

16.     Diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and the Individual Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

17.     This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question pertaining to the claims made in the Securities Class Action.

18.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

19.     Venue is proper in this District because both Tableau and Salesforce are incorporated in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

20.     Plaintiff is a current shareholder of Salesforce. Plaintiff continuously held Tableau common stock at the time of the wrongdoing alleged in this Complaint through the closing of the Merger, at which time, by dint of the Merger, Plaintiff became a shareholder of Salesforce, and since which time Plaintiff has continuously held Salesforce common stock.

21.     Plaintiff is a citizen of New York.

### Nominal Defendant Tableau

22.     Tableau is a Delaware corporation with its principal executive offices located at 1621 N. 34th Street, Seattle, Washington 98103. Tableau is an indirect wholly-owned subsidiary of Salesforce. Prior to the Merger, Tableau's stock traded on the NYSE under the ticker symbol "DATA."

**Nominal Defendant Salesforce**

23.     Salesforce is a Delaware corporation with its principal executive offices located at 415 Mission Street, 3rd Floor, San Francisco, California 94105. Salesforce's shares trade on the NYSE under the ticker symbol "CRM."

**Defendant Chabot**

24.     Defendant Christian Chabot ("Chabot") is one of the Company's co-founders and served as the Company's Chairman from 2003 until he resigned on August 1, 2019. He also served as the Company's CEO from 2003 to August 2016. According to the Company's Schedule 14A filed with the SEC on March 31, 2015 (the "2015 Proxy Statement), as of March 18, 2015, Defendant Chabot beneficially owned 1,410 shares of the Company's Class A common stock and 6,477,177 shares of the Company's Class B Common stock, which combined represented 24.19% of the total shareholder voting power on that date.[2] Given that the price per share of the Company's Class A common stock at the close of trading on March 18, 2015 was $97.88, Chabot owned at least $634.1 million worth of Tableau common stock.

25.     For the fiscal year ended December 31, 2015, Defendant Chabot received $530,901 in compensation from the Company. This included $375,000 in salary, and $155,901 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Chabot received $376,500 in compensation from the Company. This included $375,000 in salary, and $1,500 in all other compensation.

---

[2] His shares included 533,177 shares of Class B common stock issuable pursuant to stock options exercisable within 60 days of March 18, 2015 and 313 shares of Class A Common Stock issuable pursuant to restricted stock units ("RSUs") within 60 days of March 18, 2015.

26.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Chabot made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 9, 2015 | 50,958 | $   94.11 | $   4,795,657 |
| February 9, 2015 | 82,242 | $   93.43 | $   7,683,870 |
| February 9, 2015 | 4,800 | $   95.00 | $   456,000 |
| February 10, 2015 | 48,796 | $   95.52 | $   4,660,994 |
| February 10, 2015 | 33,004 | $   94.58 | $   3,121,518 |
| February 10, 2015 | 33,474 | $   93.57 | $   3,132,162 |
| February 10, 2015 | 10,726 | $   92.69 | $   994,193 |
| February 11, 2015 | 6,500 | $   96.77 | $   629,005 |
| February 11, 2015 | 29,500 | $   96.06 | $   2,833,770 |
| February 13, 2015 | 10,221 | $  100.00 | $   1,022,100 |
| February 17, 2015 | 104 | $   98.15 | $   10,208 |
| February 19, 2015 | 120,379 | $  100.12 | $   12,052,345 |
| February 20, 2015 | 19,400 | $  100.37 | $   1,947,178 |
| May 12, 2015 | 10,365 | $  108.05 | $   1,119,398 |
| May 12, 2015 | 1,000 | $  110.61 | $   110,610 |
| May 12, 2015 | 91,351 | $  109.84 | $   10,033,994 |
| May 12, 2015 | 47,284 | $  108.98 | $   5,153,010 |
| May 18, 2015 | 83 | $  110.51 | $   9,172 |
| August 3, 2015 | 150,000 | $  101.12 | $   15,168,000 |
| August 17, 2015 | 90 | $  106.50 | $   9,585 |
| November 10, 2015 | 5,500 | $   97.44 | $   535,920 |
| November 10, 2015 | 56,325 | $   95.92 | $   5,402,694 |
| November 10, 2015 | 21,675 | $   96.61 | $   2,094,022 |
| November 11, 2015 | 14,500 | $   95.92 | $   1,390,840 |
| November 11, 2015 | 52,000 | $   95.32 | $   4,956,640 |
| November 16, 2015 | 88 | $   93.13 | $   8,195 |

Thus, in total, before the fraud was exposed, he sold 900,365 Company shares on inside information, representing approximately 13% of his stock holdings at the beginning of the Relevant Period, for which he received over $89.3 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

27.     The Company's Schedule 14A filed with the SEC on March 31, 2016 (the "2016 Proxy Statement) stated the following about Defendant Chabot:

> *Christian Chabot*[3] is one of our co-founders and has served as our Chief Executive Officer and Chairman of our Board since our inception in 2003. Prior to joining us, Mr. Chabot served as an Associate Partner at Softbank Venture Capital, a venture capital firm. Prior to Softbank, Mr. Chabot was the President and co-founder of BeeLine LLC, a visualization software company. He holds an M.B.A. from Stanford University, an M.Sc. from the University of Sussex and a B.S. from Stanford University. Mr. Chabot was chosen to serve on our Board because he is a co-founder, a significant stockholder and our Chief Executive Officer.

28.     Upon information and belief, Defendant Chabot is a resident of Washington.

**Defendant Walker**

29.     Defendant Thomas E. Walker Jr. ("Walker") served as the Company's CFO from 2008 until he was replaced on February 1, 2018 following his resignation. According to the 2015 Proxy Statement, as of March 18, 2015, Defendant Walker beneficially owned 44,105 shares of the Company's Class A common stock and 194,874 shares of the Company's Class B Common stock.[4] Given that the price per share of the Company's Class A common stock at the close of trading on March 18, 2015 was $97.88, Walker owned at least $23.4 million worth of Tableau stock.

30.     For the fiscal year ended December 31, 2015, Defendant Walker received $3,884,118 in compensation from the Company. This included $300,000 in salary, $3,428,568 in stock awards, $150,000 in non-equity incentive plan compensation, and $5,550 in all other compensation. For the fiscal year ended December 31, 2016, Defendant Walker received

---

[3] Emphasis throughout this Complaint is in the original sources quoted unless otherwise noted.

[4] His Tableau stockholding included (i) 43,026 shares of Class A common stock held by the Thomas and Katherine Walker Living Trust, for which Defendant Walker held voting and dispositive power, (ii) 194,874 shares of Class B Common stock issuable pursuant to stock options exercisable within 60 days of March 18, 2015 and (iii) 313 shares of Class A Common Stock issuable pursuant to RSUs within 60 days of March 18, 2015.

$2,973,849 in compensation from the Company. This included $350,000 in salary, a bonus of $124,500, $2,468,799 in stock awards, $29,050 in non-equity incentive plan compensation, and $1,500 in all other compensation.

31.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Walker made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 9, 2015 | 62,503 | $    93.81 | $       5,863,406 |
| February 9, 2015 | 58,009 | $    93.10 | $       5,400,638 |
| February 9, 2015 | 9,488 | $    94.98 | $          901,170 |
| February 17, 2015 | 135 | $    98.32 | $            13,273 |
| March 4, 2015 | 20,000 | $    91.25 | $       1,825,000 |
| May 12, 2015 | 24,146 | $  108.29 | $       2,614,770 |
| May 12, 2015 | 15,854 | $  109.17 | $       1,730,781 |
| May 18, 2015 | 132 | $  110.51 | $            14,587 |
| June 1, 2015 | 17,000 | $  113.06 | $       1,922,020 |
| June 1, 2015 | 3,000 | $  111.79 | $          335,370 |
| July 31, 2015 | 5,000 | $  106.19 | $          530,950 |
| July 31, 2015 | 15,000 | $  106.64 | $       1,599,600 |
| August 3, 2015 | 15,000 | $  103.36 | $       1,550,400 |
| August 3, 2015 | 5,000 | $  104.65 | $          523,250 |
| August 17, 2015 | 136 | $  106.50 | $            14,484 |
| September 1, 2015 | 20,000 | $    93.08 | $       1,861,600 |
| November 10, 2015 | 40,000 | $    97.23 | $       3,889,200 |
| November 16, 2015 | 135 | $    93.13 | $            12,573 |
| December 1, 2015 | 3,200 | $    97.34 | $          311,488 |
| December 1, 2015 | 16,800 | $    97.00 | $       1,629,600 |

Thus, in total, before the fraud was exposed, he sold 330,538 Company shares on inside information, representing all the stock held by Defendant Walker at the beginning of the Relevant Period, in addition to hundreds of thousands of Tableau shares he received during the Relevant Period, for which he received over $32.5 million. His insider sales made with knowledge of

material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

32.     The Company's 2016 Proxy Statement stated the following about Defendant Walker:

> *Thomas Walker* has served as our Chief Financial Officer since July 2008 and, prior to that, served as our Vice President, Finance and Operations. Prior to joining us, Mr. Walker served as Vice President, Finance and Administration at Beacon Fire and Safety LP, which was subsequently acquired by Cintas Corporation. Mr. Walker has over 20 years of experience in software and publishing, including roles in corporate finance at Time Warner Inc. and IDG Books Worldwide, Inc., which was subsequently acquired by John Wiley & Sons, Inc. Mr. Walker holds an M.B.A. from CUNY Baruch College and a B.S. from Arizona State University.

33.     Upon information and belief, Defendant Walker is a resident of Washington.

**Defendant Baskett**

34.     Defendant Forest Baskett ("Baskett") served as a Company a director from 2008 until his resignation, effective February 24, 2017. According to the 2015 Proxy Statement, as of March 18, 2015, Defendant Baskett beneficially owned 43,178 shares of the Company's Class A common stock and 1,989,907 shares of the Company's Class B common stock, which combined represented 7.59% of the total shareholder voting power on that date.[5] Given that the price per share of the Company's Class A common stock at the close of trading on March 18, 2015 was $97.88, Baskett owned at least approximately $199 million worth of Tableau stock.

---

[5] Defendant Baskett's Class B share ownership consisted of (i) 1,964,192 shares of Class B common stock held by New Enterprise Associates 11, Limited Partnership ("NEA 11") and (ii) 4,048 shares of Class B common stock held by NEA Ventures 2004, L.P. ("Ven 2004"). Defendant Baskett's Class A share ownership included 43,178 shares of Class A common stock held by the Baskett Family Trust u/a 10/12/2010, for which Defendant Baskett held voting and dispositive power, and 21,667 shares of Class B common stock issuable pursuant to stock options exercisable within 60 days of March 18, 2015.

35.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Baskett sold 10,500 shares of Company stock on February 11, 2015, at a price of $96.00 per share, and sold 26,667 shares of Company stock on November 10, 2017, at a price of $93.97 per share. Thus, Defendant Baskett sold a total of 37,167 shares from which he received over $3.5 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

36.     The Company's 2016 Proxy Statement stated the following about Defendant Baskett:

> *Forest Baskett* has served as a member of our Board since August 2008. Dr. Baskett has been a General Partner with NEA, since 2004, where he focuses on information and energy technology investments. Dr. Baskett joined NEA in 1999. From 1986 to 1999, Dr. Baskett served as Chief Technology Officer and Senior Vice President, Research and Development of Silicon Graphics Inc. Prior to joining Silicon Graphics, he founded and directed the Western Research Laboratory of Digital Equipment Corporation from 1982 to 1986, and was a professor of Computer Science and Electrical Engineering at Stanford University from 1971 to 1982. Dr. Baskett also serves on the boards of various private technology companies. Dr. Baskett holds a Ph.D. in Computer Science from the University of Texas at Austin and a B.A. from Rice University. He is also a member of the National Academy of Engineering. Dr. Baskett was chosen to serve on our Board due to his extensive experience with a wide range of technology companies and the venture capital industry.

37.     Upon information and belief, Defendant Baskett is a resident of California.

**Defendant Bosworth**

38.     Defendant William "Billy" Bosworth ("Bosworth") served as a member of the Board from May 2015 until he resigned on August 1, 2019. According to the 2015 Proxy Statement, as of March 18, 2015, Defendant Bosworth beneficially owned 1,000 shares of the Company's Class B common stock. Given that the price per share of the Company's Class A

common stock at the close of trading on March 18, 2015 was $97.88, Bosworth owned at least $97,880 worth of Tableau stock.

39.     For the fiscal year ended December 31, 2015, Defendant Bosworth received $443,919 in compensation from the Company. This included $39,375 in fees earned or paid in cash, and $404,544 in stock awards. For the fiscal year ended December 31, 2016, Defendant Bosworth received $279,246 in compensation from the Company. This included $52,500 in fees earned or paid in cash, and $226,746 in stock awards.

40.     The Company's 2016 Proxy Statement stated the following about Defendant Bosworth:

> *Billy Bosworth* has served as a member of our Board since May 2015. Mr. Bosworth has served as the President and Chief Executive Officer and as a member of the board of DataStax, Inc., a provider of open-source and big-data database technology, since May 2011. Prior to joining DataStax, Mr. Bosworth held positions at Quest Software, a provider of systems management software, from June 2005 to May 2011, where his most recent role was Vice President and General Manager of the database business unit. Mr. Bosworth holds a B.S. in Information Science and Data Processing from the University of Louisville. Mr. Bosworth was chosen to serve on our Board due to his experience in the database industry, and in particular, his extensive background in product management and development.

41.     Upon information and belief, Defendant Bosworth is a resident of California.

**Defendant Hanrahan**

42.     Defendant Patrick Hanrahan ("Hanrahan") is a co-founder of Tableau and served as the Company's Chief Scientist and as a Company director from 2003 until he resigned on August 1, 2019. According to the 2015 Proxy Statement, as of March 18, 2015, Defendant Hanrahan beneficially owned 7,888,278 shares of the Company's Class B common stock, representing 30.05% of the total shareholder voting power on that date. Given that the price per share of the Company's common stock at the close of trading on March 18, 2015 was $97.88, Hanrahan owned at least $772.1 million worth of Tableau stock.

43.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Hanrahan made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 9, 2015 | 7,200 | $ 94.49 | $ 680,328 |
| February 9, 2015 | 17,239 | $ 93.24 | $ 1,607,364 |
| February 9, 2015 | 21,561 | $ 92.65 | $ 1,977,627 |
| February 9, 2015 | 4,000 | $ 95.01 | $ 380,040 |
| February 10, 2015 | 17,173 | $ 92.21 | $ 1,583,522 |
| February 10, 2015 | 28,112 | $ 93.16 | $ 2,618,914 |
| February 10, 2015 | 4,715 | $ 93.70 | $ 441,796 |
| February 11, 2015 | 50,000 | $ 95.82 | $ 4,791,000 |
| February 12, 2015 | 14,384 | $ 98.10 | $ 1,411,070 |
| February 12, 2015 | 35,616 | $ 97.21 | $ 3,462,231 |
| May 14, 2015 | 6,700 | $ 110.32 | $ 739,144 |
| May 14, 2015 | 3,136 | $ 112.92 | $ 354,117 |
| May 14, 2015 | 44,264 | $ 112.37 | $ 4,973,946 |
| May 14, 2015 | 10,900 | $ 111.35 | $ 1,213,715 |
| May 19, 2015 | 30,000 | $ 113.00 | $ 3,390,000 |
| August 13, 2015 | 65,000 | $ 104.08 | $ 6,765,200 |
| November 12, 2015 | 26,611 | $ 95.48 | $ 2,540,818 |
| November 12, 2015 | 19,469 | $ 97.50 | $ 1,898,228 |
| November 12, 2015 | 15,320 | $ 96.40 | $ 1,476,848 |
| November 12, 2015 | 3,600 | $ 98.21 | $ 353,556 |

Thus, in total, before the fraud was exposed, he sold 425,000 Company shares on inside information for which he received over $42.6 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

44.     The Company's 2016 Proxy Statement stated the following about Defendant Hanrahan:

*Patrick Hanrahan* has served as our Chief Scientist and as a member of our Board since our inception in 2003. Dr. Hanrahan is also currently the CANON Professor of Computer Science and Electrical Engineering at Stanford University, where he teaches computer graphics and is researching visualization, image synthesis, and

graphics systems and architectures. Dr. Hanrahan is a part-time employee of Tableau, with approximately 20% of his professional time currently dedicated to Tableau. Prior to joining us, Dr. Hanrahan served as senior scientist at Pixar Animation Studios. Prior to joining Stanford, Dr. Hanrahan was an Associate Professor at Princeton University. Dr. Hanrahan holds a Ph.D. in Biophysics and a B.S. from the University of Wisconsin—Madison. Dr. Hanrahan was chosen to serve on our Board because he is a co-founder, a significant stockholder and, as our Chief Scientist, has a deep understanding of our products and technology.

45.     Upon information and belief, Defendant Hanrahan is a resident of California.

**Defendant Jurgensen**

46.     Defendant Elliott "Ren" Jurgensen Jr. ("Jurgensen") served as a Company director from 2012 until he resigned on August 1, 2019. According to the 2015 Proxy Statement, as of March 18, 2015, Defendant Jurgensen beneficially owned 2,662 shares of the Company's Class A common stock, and 34,500 shares of the Company's Class B common stock.[6] Given that the price per share of the Company's common stock at the close of trading on March 18, 2015 was $97.88, Jurgensen owned over $3.6 million worth of Tableau stock.

47.     For the fiscal year ended December 31, 2015, Defendant Jurgensen received $325,064 in compensation from the Company, comprised of $65,000 in fees earned or paid in cash and $260,064 in stock awards. For the fiscal year ended December 31, 2016, Defendant Jurgensen received $291,746 in compensation from the Company, comprised of $65,000 in fees earned or paid in cash and $226,746 in stock awards.

48.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Jurgensen made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
| --- | --- | --- | --- |

---

[6] His shares included 34,500 shares of Class B common stock issuable pursuant to stock options exercisable within 60 days of March 18, 2015 and 796 shares of Class A Common Stock issuable pursuant to RSUs within 60 days of March 18, 2015.

| February 9, 2015 | 5,500 | $ 95.00 | $ 522,500 |
| May 20, 2015 | 2,500 | $ 113.19 | $ 282,975 |
| November 13, 2015 | 4,000 | $ 93.78 | $ 375,120 |

Thus, in total, before the fraud was exposed, he sold 12,000 Company shares on inside information for which he received nearly $1.2 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

49.     The Company's 2016 Proxy Statement stated the following about Defendant Jurgensen:

*Elliott Jurgensen, Jr.* has served as a member of our Board since September 2012. Mr. Jurgensen retired from KPMG LLP, an international public accounting firm, in January 2003 after 32 years, including 23 years as an audit partner. During his public accounting career at KPMG, he held a number of leadership positions, including Managing Partner of the Bellevue, Washington office from 1982 to 1991 and Managing Partner of the Seattle, Washington office from 1993 to 2002. Mr. Jurgensen currently serves on the board of BSquare Corporation. Mr. Jurgensen has a B.S. from California State University, San Jose. Mr. Jurgensen was chosen to serve on our Board due to his substantial financial expertise that includes extensive knowledge of the complex financial and operational issues facing publicly-traded companies and a deep understanding of accounting principles and financial reporting rules and regulations. He also brings professional service expertise, technology industry experience, experience as a public company board member, and sales and marketing experience at KPMG

50.     Upon information and belief, Defendant Jurgensen is a resident of Washington.

**Defendant McAdam**

51.     Defendant John McAdam Jr. ("McAdam") served as a Company director from 2012 until he resigned on August 1, 2019. According to the 2015 Proxy Statement, as of March 18, 2015, Defendant McAdam beneficially owned 3,182 shares of the Company's Class A

common stock, and 36,250 shares of the Company's Class B common stock.[7] Given that the price per share of the Company's common stock at the close of trading on March 18, 2015 was $97.88, McAdam owned over $3.8 million worth of Tableau stock.

52.     For the fiscal year ended December 31, 2015, Defendant McAdam received $335,064 in compensation from the Company, comprised of $75,000 in fees earned or paid in cash and $260,064 in stock awards. For the fiscal year ended December 31, 2016, Defendant McAdam received $306,746 in compensation from the Company, comprised of $80,000 in fees earned or paid in cash and $226,746 in stock awards.

53.     The Company's 2016 Proxy Statement stated the following about Defendant McAdam:

> *John McAdam* has served as a member of our Board since December 2012 and as our lead independent director since May 2015. Mr. McAdam has served as the President and Chief Executive Officer and a member of the board of directors of F5 Networks, Inc., a provider of application delivery networking technology, since July 2000 (with the exception of the period of July 1, 2015 to December 13, 2015, when he served as F5's non-executive Board Chairman). Prior to joining F5 Networks, Mr. McAdam served as General Manager of the Web server sales business at IBM from September 1999 to July 2000. From January 1995 until August 1999, Mr. McAdam served as the President and Chief Operating Officer of Sequent Computer Systems, Inc., a manufacturer of high-end open systems, which was sold to IBM in September 1999. Mr. McAdam also serves on the boards of two private technology companies. Mr. McAdam holds a B.S. from the University of Glasgow, Scotland. Mr. McAdam was chosen to serve on our Board due to his experience in the technology industry, and in particular, his experience managing F5 Networks through a period of high growth.

54.     Upon information and belief, Defendant McAdam is a resident of Washington.

**<u>Defendant Seawell</u>**

---

[7]  His shares included 36,250 shares of Class B common stock issuable pursuant to stock options exercisable within 60 days of March 18, 2015 and 796 shares of Class A Common Stock issuable pursuant to RSUs within 60 days of March 18, 2015.

55.     Defendant Brooke Seawell ("Seawell") served as a Company director from 2011 until he resigned on August 1, 2019. According to the 2015 Proxy Statement, as of March 18, 2015, Defendant Seawell beneficially owned 796 shares of the Company's Class A common stock, and 17,500 shares of the Company's Class B common stock.[8] Given that the price per share of the Company's common stock at the close of trading on March 18, 2015 was $97.88, Seawell owned over $1.79 million worth of Tableau stock.

56.     For the fiscal year ended December 31, 2015, Defendant Seawell received $320,064 in compensation from the Company, comprised of $60,000 in fees earned or paid in cash and $260,064 in stock awards. For the fiscal year ended December 31, 2016, Defendant Seawell received $286,746 in compensation from the Company, comprised of $60,000 in fees earned or paid in cash and $226,746 in stock awards.

57.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Seawell made the following sales of Company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 9, 2015 | 197 | $   95.00 | $          18,715 |
| February 10, 2015 | 500 | $   95.46 | $          47,730 |
| February 10, 2015 | 295 | $   95.50 | $          28,173 |
| February 11, 2015 | 5,000 | $   97.68 | $        488,400 |
| May 14, 2015 | 5,796 | $ 112.02 | $        649,268 |

Thus, in total, before the fraud was exposed, he sold 11,788 Company shares on inside information, for which he received over $1.2 million. His insider sales made with knowledge of material non-

---

[8] His shares included (i) 10,000 shares of Class B common stock held by the Rosemary & A. Brooke Seawell Revocable Trust dated 12/20/09, restated 6/29/10, for which Defendant Seawell held voting and dispositive power, (ii) 7,500 shares of Class B common stock issuable pursuant to stock options exercisable within 60 days of March 18, 2015 and (iii) 796 shares of Class A Common Stock issuable pursuant to RSUs within 60 days of March 18, 2015.

public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

58.     The Company's 2016 Proxy Statement stated the following about Defendant Seawell:

> *Brooke Seawell* has served as a member of our Board since November 2011. Mr. Seawell has been a Venture Partner with NEA, a venture capital firm, since January 2005. Prior to joining NEA, Mr. Seawell was a Partner with Technology Crossover Ventures, a venture capital firm, from February 2000 to December 2004. Mr. Seawell also served as Executive Vice President of NetDynamics Inc., an application server software company that was acquired by Sun Microsystems, Inc., from 1997 to 1998, and Senior Vice President, Finance and Operations and Chief Financial Officer of Synopsys, an electronic design automation software company, from 1991 to 1997. Mr. Seawell previously served as Vice President, Finance and Production and Chief Financial Officer of Weitek Corporation, a fabless semiconductor company, from 1983 to 1991, and co-founder and Chief Financial Officer of Southwall Technologies, Inc., a complex thin film coatings company, from 1979 to 1983. Mr. Seawell currently serves on the boards of NVIDIA Corporation and various private technology companies. Mr. Seawell also is a member of the Stanford University Athletic Board and previously served on the Management Board of the Stanford Graduate School of Business. Mr. Seawell holds an M.B.A. from Stanford University and a B.A. from Stanford University. Mr. Seawell was chosen to serve on our Board due to his more than 30 years of experience in technology finance and operations, including having served as the chief financial officer of two public companies, his experience in the venture capital industry and his experience as a director of high technology companies.

59.     Upon information and belief, Defendant Seawell is a resident of California.

**Defendant Stolte**

60.     Defendant Christopher Stolte ("Stolte") is a co-founder of Tableau, and served as a Company director from 2003 until he resigned on August 1, 2019. Defendant Stolte previously served as the Company's Chief Development Officer from 2010 to August 2016, and prior to that, served as Tableau's Vice President of Engineering. According to the 2015 Proxy Statement, as of March 18, 2015, Defendant Stolte beneficially owned 1,410 shares of the Company's Class A common stock, and 5,599,052 shares of the Company's Class B common stock, which combined

represented 20.91% of the total shareholder voting power on that date.[9] Given that the price per share of the Company's common stock at the close of trading on March 18, 2015 was $97.88, Stolte owned at least $548.17 million worth of Tableau stock.

61.     During the period of time when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Stolte made the following sales of company stock, and made no purchases of Company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 9, 2015 | 25,049 | $   94.14 | $    2,358,113 |
| February 9, 2015 | 2,500 | $   95.00 | $      237,500 |
| February 9, 2015 | 52,938 | $   93.50 | $    4,949,703 |
| February 10, 2015 | 41,157 | $   95.58 | $    3,933,786 |
| February 10, 2015 | 39,313 | $   93.85 | $    3,689,525 |
| February 10, 2015 | 14,196 | $   92.84 | $    1,317,957 |
| February 10, 2015 | 36,922 | $   94.93 | $    3,505,005 |
| February 11, 2015 | 33,925 | $   96.12 | $    3,260,871 |
| February 11, 2015 | 4,000 | $   96.97 | $      387,880 |
| February 13, 2015 | 30,353 | $ 100.00 | $    3,035,300 |
| February 17, 2015 | 104 | $   98.15 | $       10,208 |
| February 19, 2015 | 132,597 | $ 100.14 | $   13,278,025 |
| February 20, 2015 | 72,350 | $ 100.37 | $    7,261,567 |
| February 26, 2015 | 14,700 | $ 100.00 | $    1,470,000 |
| March 3, 2015 | 150,000 | $   94.43 | $   14,165,085 |
| May 12, 2015 | 67,375 | $ 110.10 | $    7,417,988 |
| May 12, 2015 | 113,912 | $ 109.57 | $   12,481,338 |
| May 12, 2015 | 30,213 | $ 108.38 | $    3,274,485 |
| May 13, 2015 | 9,977 | $ 109.95 | $    1,096,971 |
| May 13, 2015 | 28,523 | $ 109.15 | $    3,113,285 |
| May 18, 2015 | 84 | $ 110.45 | $        9,278 |
| June 1, 2015 | 31,500 | $ 112.02 | $    3,528,630 |
| June 1, 2015 | 95,229 | $ 112.94 | $   10,755,163 |
| June 1, 2015 | 23,271 | $ 113.54 | $    2,642,189 |
| August 3, 2015 | 160,000 | $ 101.23 | $   16,196,800 |
| August 4, 2015 | 90,000 | $ 100.05 | $    9,004,500 |

[9] His shares included 533,177 shares of Class B common stock issuable pursuant to stock options exercisable within 60 days of March 18, 2015 and 313 shares of Class A Common Stock issuable pursuant to restricted stock units ("RSUs") within 60 days of March 18, 2015.

| August 17, 2015 | 90 | $ 106.50 | $ 9,585 |
| November 10, 2015 | 5,500 | $ 97.44 | $ 6,209,804 |
| November 10, 2015 | 56,325 | $ 95.92 | $ 7,738,561 |
| November 10, 2015 | 21,675 | $ 96.61 | $ 2,112,306 |
| November 11, 2015 | 14,500 | $ 95.92 | $ 497,148 |
| November 11, 2015 | 52,000 | $ 95.32 | $ 6,720,846 |
| November 16, 2015 | 88 | $ 93.13 | $ 9,385,385 |

Thus, in total, before the fraud was exposed, he sold 1,700,336 Company shares on inside information, representing approximately 27% of his stock holdings at the beginning of the Relevant Period, for which he received approximately $170.3 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

62.     The Company's 2016 Proxy Statement stated the following about Defendant Stolte:

*Christopher Stolte* is one of our co-founders and has served as a member of our Board since our inception in 2003. Dr. Stolte has served as our Chief Development Officer since May 2010, and prior to that served as our Vice President of Engineering. Prior to joining us, Dr. Stolte was the Chief Technology Officer and co-founder of BeeLine LLC. Dr. Stolte holds a Ph.D. in Computer Science from Stanford University and a B.S. from Simon Fraser University. Dr. Stolte was chosen to serve on our Board because he is a co-founder, a significant stockholder and, as our Chief Development Officer, has a deep understanding of our products and technology.

63.     Upon information and belief, Defendant Stolte is a resident of Washington.

**Defendant Ajenstat**

64.     Defendant Francois Ajenstat ("Ajenstat") has served as the Company's Chief Product Officer since August 2016. Prior to that role, Defendant Ajenstat was the Company's Vice President and Director or Product Management starting from January 2015.

65.     Tableau's website states the following about Defendant Ajenstat:[10]

Francois Ajenstat is Tableau's Chief Product Officer. Francois Ajenstat is responsible for Tableau's overall product strategy and oversees the product

---

[10] https://www.tableau.com/about/leadership. Last visited March 10, 2020.

portfolio including product packaging, pricing and product positioning. He is also responsible for evangelizing Tableau's products with customers and partners and incorporating customer and partner feedback into the strategic vision of the Tableau portfolio. Francois brings a wealth of product management experience in the business intelligence industry. Prior to joining Tableau, Francois worked at Microsoft for 10 years in a number of different groups including SQL Server, Office and Trustworthy Computing. Before that, he worked for Cognos Corporation (acquired by IBM) leading strategic alliances with key industry partners such as IBM, HP, and Microsoft.

The first time Francois saw Tableau, over 10 years ago, he recognized the potential to transform the industry and revolutionize how people work with data. "I knew I needed to be part of what was to become an entire new era in business analytics and it's been incredible to be part of the team that is making that vision a reality."

66.     Upon information and belief, Defendant Ajenstat is a resident of Washington.

**Defendant Peir**

67.     Defendant Jay Peir ("Peir") has served as the Company's Executive Vice President,

Corporate Development and Strategy since November 2011.

68.     Tableau's website states the following about Defendant Peir:[11]

Jay Peir is Tableau's Executive Vice President of Corporate Strategy, responsible for corporate strategy and pricing. He also advises the Tableau Foundation, which he helped to establish in 2013. Prior to joining Tableau in 2011, he served in various senior roles at SunPower Corporation (NASDAQ: SPWR) including as VP of Corporate Development, VP & Treasurer, and as CFO. While at SunPower, Jay helped scale the organization from a start-up to a multi-billion dollar solar energy company.

Jay brings over 20 years of experience in finance, mergers and acquisitions, strategic planning, and business development. He earned a bachelor's and master's degree in electrical engineering from Stanford University, as well as an MBA from Stanford Business School.

"I'm amazed every day by the passion and desire to make a difference that characterizes our employees and our culture. I am proud to be a part of the company that is revolutionizing how people see and understand data."

69.     Upon information and belief, Defendant Peir is a resident of California.

---

[11] https://www.tableau.com/about/leadership. Last visited March 10, 2020.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

70.     By reason of their positions as officers, directors, and /or controlling shareholders of Tableau and because of their ability to control the business and corporate affairs of Tableau, the Individual Defendants owed Tableau and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Tableau in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Tableau and its shareholders so as to benefit all shareholders equally.

71.     Each director, officer, and controlling shareholder of the Company owed to Tableau and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

72.     The Individual Defendants, because of their positions of control and authority as directors, officers, and/or controlling shareholders of Tableau, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

73.     To discharge their duties, the officers, directors, and controlling shareholders of Tableau were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

74.     Each Individual Defendant, by virtue of his or her position as a director, officer, and/or controlling shareholder owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Tableau, the absence of good

faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers, directors, and/or controlling shareholders of the Company has been ratified by the remaining Individual Defendants who collectively comprised Tableau's Board at all relevant times.

75.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Securities and Exchange Act of 1934 ("Exchange Act") and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

76.     To discharge their duties, the officers and directors of Tableau were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Tableau were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Washington, and the United States, and pursuant to Tableau's own Code of Business Conduct and Ethics;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Tableau conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Tableau and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Tableau's operations would comply with all applicable laws and Tableau's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

77.     Each of the Individual Defendants further owed to Tableau and the shareholders the duty of loyalty requiring that each favor Tableau's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

78.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Tableau and were at all times acting within the course and scope of such agency.

79.     Because of their advisory, executive, managerial, directorial, and controlling shareholder positions with Tableau, each of the Individual Defendants had access to adverse, non-public information about the Company.

80.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Tableau.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

81.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

82.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future

business prospects and internal controls; and (iii) to artificially inflate the Company's stock price while many of the Individual Defendants engaged in insider trading.

83.     The Individual Defendants accomplished their conspiracy, common enterprise, and common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Tableau was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

84.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

85.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Tableau and was at all times acting within the course and scope of such agency.

## TABLEAU'S CODE OF BUSINESS CONDUCT AND ETHICS

86.     Tableau's Code of Business Conduct and Ethics (the "Code of Conduct") provided that "[i]t is the responsibility of every employee, officer and director of Tableau to read, understand and comply with the spirit, as well as the letter, of the Code [of Conduct]."

87.    The introduction to the Code of Conduct underscored the importance of honesty, stating, in relevant part, that: "'We Are Honest' is among our company's core values. Honesty is not simply a Board of Directors issue or a management issue; it is an everyone issue."

88.    The Code of Conduct provided, as to "Honest and Ethical Conduct" that:

It is the policy of Tableau to promote high standards of integrity by conducting our affairs in an honest and ethical manner. The integrity and reputation of Tableau depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity and a long-held commitment of Tableau.

89.    The Code of Conduct provided, as to "Legal Compliance" that:

Obeying the law is the common thread among the specific provisions of this Code. Our success depends upon each employee, officer and director operating within legal guidelines and cooperating with local, national and international authorities. We expect employees, officers and directors to understand the legal and regulatory requirements applicable to their areas of responsibility. While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you do have a question in the area of legal compliance, it is important that you not hesitate to seek answers from your supervisor or the Compliance Officer. Section 15 below details the compliance resources available to you.

Disregard of the law will not be tolerated. Violation of laws, rules and regulations of any country may subject an individual, as well as Tableau, to civil and/or criminal penalties. You should be aware that conduct and records, including emails, are subject to internal and external audits and to discovery by third parties in the event of an investigation or litigation.

90.    The Code of Conduct provided, as to "Insider Trading," that:

Employees, officers and directors who have access to confidential information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about Tableau or about companies with which we do business is considered confidential (or "inside") information. To use material inside information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. Employees, officers and directors must exercise the utmost care when handling material inside information.

91.    The Code of Conduct provided, with respect to maintaining records and public

reporting, in relevant part, that:

> no employee, officer or director should knowingly make (or cause or encourage
> any other person to make) any false or misleading statement in any of our reports
> filed with the SEC or knowingly omit (or cause or encourage any other person to
> omit) any information necessary to make the disclosure in any of our reports
> accurate in all material respects

92.    The Code of Conduct provided, with respect to "Reporting Possible Violations," in

relevant part, that:

> If you are aware of a suspected or actual violation of Code standards by others, you
> have a responsibility to report it. You are expected to promptly report the violation
> that you believe has occurred, including any information you have about the
> persons involved and the time of the violation. Whether you choose to speak with
> your supervisor or the Compliance Officer, you should do so without fear of any
> form of retaliation. We will take prompt disciplinary action against any employee
> who retaliates against you.
>
> Supervisors must promptly report any complaints or observations of Code
> violations to the Compliance Officer. If you believe your supervisor has not taken
> appropriate action, you should contact the Compliance Officer directly. The
> Compliance Officer will investigate all reported possible Code violations promptly
> and with the highest degree of confidentiality that is possible under the specific
> circumstances. . . .

93.    In violation of the Code of Conduct, the Individual Defendants conducted little, if

any, oversight of the Company's internal controls over public reporting and of the Company's

engagement in the Individual Defendants' scheme to issue materially false and misleading

statements to the public and facilitate and disguise the Individual Defendants' violations of law,

including breaches of fiduciary duty and unjust enrichment. Seven of the Individual Defendants

violated the Code of Conduct by selling shares while in possession of material, non-public

information about the Company. Moreover, in violation of the Code of Conduct, the Individual

Defendants failed to maintain the accuracy of Company records and reports, comply with laws and

regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

94.     Tableau, founded by Defendants Hanrahan, Stolte, and Chabot, provides business analytics and software products.

95.     During the Relevant Period, Tableau had developed five key products: (1) Tableau Desktop, a self-service analytics product for use by any person with data; (2) Tableau Server, a business intelligence platform for use by organizations; (3) Tableau Online, a cloud-based software-as-a-service ("SaaS") version of Tableau Server; (4) Tableau Public, a free cloud-based platform for analyzing and sharing public data; and (5) Vizable, a free application launched during the Relevant Period used to analyze data on a tablet.

96.     Tableau derived revenues from two primary sources—license revenue and maintenance & service revenue. During the Relevant Period, license revenue accounted for approximately two-thirds of Tableau's total revenue, with maintenance and service revenue accounting for the remainder.

97.     License revenue was not only Tableau's largest source of revenue, but it also generated a stronger profit margin compared to maintenance & service revenue, which was also to some extent dependent on software licenses. During the Relevant Period, license revenue generated a gross profit margin of approximately 100%, compared to a 70% gross profit margin for maintenance & service revenue. The Company's customers also typically entered into multiple element arrangements that included maintenance services, and thus maintenance & service revenue was largely dependent on the sale of software licenses. The revenue generated from the

Company's license agreements included sales of licenses to new customers as well as incremental licenses to existing customers and was comprised mainly (90%) of fees from perpetual licenses.

98.     When the Company was founded in 2003, it was operating in a relatively novel and open market space, allowing for rapid adoption and minimal pricing pressure.

99.     By the beginning of the Relevant Period, however, a number of established technology companies were poised to release, or had already released, products that would compete with Tableau's offerings. These new competitors included household names such as IBM, Amazon, and Microsoft, as well as other firms such as MicroStrategy, Inc. ("MicroStrategy"), Qlik Technologies Inc. ("Qlik"), SAP SE ("SAP"), Tibco Software Inc. ("TIBCO"), and Salesforce.

100.     The Individual Defendants were aware of these new market entrants, which had priced their products aggressively and possessed laudable technical, financial and marketing capabilities, and thus, knew or recklessly disregarded the threat they posed to the Company's continued growth prospects. The following table outlines competing products that were in the market at the beginning of, or released during, the Relevant Period:

| Date & Action | Company | Product | Billing/Features |
|---|---|---|---|
| 9/17/2014 (Announced) | Qlik | Sense | "the first device-independent, self-service visualization and discovery product engineered for enterprise-class governance and performance." |
| 10/13/2014 (Released) | Salesforce | Wave | "first cloud analytics platform designed for every business user, making it easier than ever for anyone to explore data, uncover new insights and take action instantly from any device." |
| 11/21/2014 (Released) | IBM | Cognos Business Intelligence | enhanced end user experience and ease of use through simplified functionality; quicker, easier deployments leading to faster time to value; improved general data access and administrative functions. |

| 7/7/2013 (Announced), 7/24/2015 (Released) | Microsoft | Power BI | ability to create color-coded 3-D mapping; region-based visualization tools; natural language queries, offering "a free-form canvas for drag-and-drop exploration of your data and an extensive library of interactive visualizations, while streamlining report creation and publishing to the . . . service." |
| --- | --- | --- | --- |
| 10/7/2015 (Released) | Amazon | Quicksight | "very fast, easy to use business intelligence for your big data needs at 1/10th the cost of traditional on-premises solutions." |

101. The Company, through the Individual Defendants, actively monitored its sales through a program known internally as "Alpo" and knew that the market competition was already negatively impacting Tableau and causing customers to stall license arrangements, although the Individual Defendants repeatedly deflected this reality throughout the Relevant Period.

102. According to the SAC filed in the Securities Class Action, certain former Company employees who were interviewed indicated that sales slowed significantly in 2014 and 2015 and that the slow-down was well-known within Tableau. Indeed, according to the SAC, these former employees indicated that Defendants Walker and Chabot attended sales meetings, and that management used analytics to detail business lost to competition and a significant price differential between Tableau's products and the new offerings on the market. The former employees, according to the SAC, also noted that increased competition led to a longer sales cycle, and a number of sales representatives missing their quotas. Moreover, the former employees indicated that everyone at the Company knew that competition was negatively impacting Tableau by March 31, 2015, at the latest.

103. Defendant Walker made the following statement on March 3, 2015 at the Pacific Crest 10th Annual Emerging Technology Summit, indicating that the Individual Defendants were surprised that competition did not impact Tableau's performance prior to the beginning of the Relevant Period: "Overall, when we entered 2014, it was a year after our IPO. And so, 2013 was

also a banner year for Tableau. And so, entering [2014], we were not expecting the same kind of pop or momentum into 2014 that we experienced."

104.    Thus, the Individual Defendants were aware that this competition was causing the Company's customers to delay or cancel pending license orders.

105.    Pursuant to Item 303 of Regulation S-K, the Company was required to disclose known trends or uncertainties that had or were reasonably likely to have a material impact on Tableau's revenues or income, such as when a registrant is aware that a competitive product has been introduced to the market at a discounted price when compared to the registrants' product. *See* 17 C.F.R. §229.503.

106.    Interpretive guidance by the SEC on compliance with Item 303 of Regulation S-K states in relevant part:

> Events that have already occurred or are anticipated often give rise to known uncertainties. For example, a registrant may know that a material government contract is about to expire. The registrant may be uncertain as to whether the contract will be renewed, but nevertheless would be able to assess facts relating to whether it will be renewed. More particularly, the registrant may know that a competitor has found a way to provide the same service or product at a price less than that charged by the registrant, or may have been advised by the government that the contract may not be renewed. The registrant also would have factual information relevant to the financial impact of non-renewal upon the registrant. In situations such as these, a registrant would have identified a known uncertainty reasonably likely to have material future effects on its financial condition or results of operations, and disclosure would be required.

107.    These disclosures were required in the Company's annual and quarterly reports on Form 10-Ks and Form 10-Qs, respectively along with Management's Discussion and Analysis of Financial Condition and Results of Operations ("MD&A").

108.    Moreover, the Company was also required to disclose certain risks that could impact any investment in the Company to investors of important matters affecting the Company

and were required to disclose the effectiveness of its internal controls. *See* Item 503 of Regulation S-K, 17 C.F.R. §229.503; Item 307 of Regulation S-K, 17 C.F.R. §229.307.

109.    As outlined below, the Individual Defendants made and/or caused the Company to make numerous false and misleading statements pertaining to the Company's prospects and operations and to the effect competition was having on Tableau. As outlined above, the Individual Defendants profited off the fraud by dumping their common stock onto the market at artificially inflated rates, netting over $337 million in proceeds from their insider transactions.

### Former Employees in the SAC

110.    The Securities Class Action corroborates allegations made in the SAC with information obtained by former Tableau employees, referred to in the SAC as "FE"s. These FEs included a Senior Sales Manager who worked at the Company from January 2011 through January 2016 (identified in the SAC as "FE-1"); a Senior Sales Area Manager who worked at the Company from January 2014 through April 2017 (identified in the SAC as "FE-2"); a Senior Vice President of the Americas who worked at the Company from May 2013 through January 2016 (identified in the SAC as "FE-3"); an Enterprise Account Manager who worked at the Company from September 2014 through December 2015 (identified in the SAC as "FE-4"); a sales employee who worked at the Company from September 2014 through at least February 2016 (identified in the SAC as "FE-5"); a Senior Commercial Sales Manager who worked at the Company from March 2014 through November 2016 (identified in the SAC as "FE-6"); and a Commercial Sales Manager who worked at the Company from October 2012 through December 2016 (identified in the SAC as "FE-7").

111.    According to FE-1 in the Securities Class Action, the Company's challenge with reaching sales targets was "well-known" at Tableau and all employees, including the Company's executives, had access to Tableau's sales data, including through regular sales meetings. FE-1

specifically recalled Defendants Walker and Chabot attending these meetings and discussing the Company's concerns with missed sales targets. FE-2 maintained in the Securities Class Action that the Company's competition—Microsoft in particular—often "threw a wrench in our plans[,]" and confirmed that the Company's management were acutely aware of Tableau's performance with respect to its competition. FE-3 in the Securities Class Action indicated that Tableau's products suffered from a "huge price gap" compared to its competitors, which included Amazon and Microsoft. FE-3 further noted that the Company's sales cycles had become drawn out by the middle of 2015 and that the Company was engaged in a "more competitive environment" as a result. FE-4, FE-5, FE-6, and FE-7 in the Securities Class Action echoed that increased competition was causing longer sales cycles for Tableau, and that the Company was finding it increasingly difficult to secure license agreements, the overall effect of which was causing a "disruption" in Tableau's business that "everybody" at Tableau understood by the beginning of 2015.

### False and Misleading Statements of Material Fact

#### *February 4, 2015 Press Release and Conference Call*

112.    On February 4, 2015, after the close of trading, the Company issued a press release titled "Tableau Reports Record Q4 and Fiscal Year 2014 Financial Results Due To Strong Enterprise Demand." The press release provided the following highlights for the fiscal quarter and year ended December 31, 2014:

Fourth Quarter 2014 Financial Highlights:

- Total revenue grew to $142.9 million, up 75% year over year.

- License revenue grew to $101.4 million, up 75% year over year.

* * *

Fiscal Year 2014 Financial Highlights:

- Total revenue grew to $412.6 million, up 78% year over year.

- License revenue grew to $279.9 million, up 75% year over year.

113.     The press release also quoted Defendant Chabot, who touted the Company's results, stating, in relevant part:

> Tableau's quarterly and fiscal 2014 results were excellent. I'm proud to say that our investments in people, product and customers paid off in 2014 with record revenue, strong customer adoption and accelerated growth in our enterprise business . . . In 2014, we experienced the strongest demand we've seen in our history, as the move to agile analytics grows faster than ever.

114.     Also on February 4, 2015, the Company held a conference call with analysts and investors. During the call, Defendant Chabot made the following statements concerning trends facing the Company in response to an analyst's question regarding the sustainability of the Company's larger-scale deployments:

> I would [say] that **the trend is towards larger and larger deployments of Tableau**. I mean, you can see it in some of the simple numbers. For example, the large transaction number we've been releasing was 781, which was huge growth over the previous year. And those are deals greater than $100,000. And those are becoming very significant. They're indicative of companies moving their entire business analytics strategy to the Tableau way of doing things.
>
> And I'm just pausing to reflect for a second; **I would go so far as to call it a pattern**. Four years ago, it was a relatively obscure thing to take one of these new, agile, self-service alternatives and go make it your enterprise, go-to BI standard. It was rare, indeed. These days, it's commonplace. Sometimes that means it's still a divisional victory or in a couple of divisions. Other times, it is the go-to analytics and reporting platform going all the way up to the CEO and occupying their most important data-driven initiatives.
>
> **I don't personally forecast any decline in that trend. In fact, I think our best years are ahead of us**.

(Emphasis added.)

115.     During the call, in response to a question about Microsoft's recently introduced product, and its significantly lower price point, Defendant Chabot downplayed its significance, stating:

Microsoft is a fierce and respected competitor, and we would certainly expect that they will be in the market for many years. This recent move is the latest in a long history of – look, we have something for free moves.

***None of those moves, historically, have had an impact on the competitive structure and dynamics in our industry****. And as such, we don't believe this one will, as well***, particularly because it does not come in combination with what we view as any profound product change.

(Emphasis added.)

116.     In response to questions about subscription-based products being offered by competitors, in particular Salesforce's Wave, Defendant Chabot stated:

***[W]e haven't seen any fundamental competitive change on the Salesforce Wave front****. That product, I would classify as a nice reporting upgrade for Salesforce data. It isn't particularly analytically rich. Obviously, there's no [permit] story. There isn't a sophisticated big data component, and so on, down the line. I think it's a good product, as far as I can tell.* ***But it, in no way, has entered our pipeline as a fundamental competitive threat at this point****. ****But we'll continue to monitor it***.

With regard to business model changes at TIBCO, I'm not an expert on that, that's a better question for them. ***I can report, again, on that front in particular. We haven't seen any shift in the competitive dynamic in the last six months***.

(Emphasis added.)

***Goldman Sachs Technology and Internet Conference***

117.     The Company participated in the Goldman Sachs Technology and Internet Conference on February 10, 2015. Defendant Walker was asked about the competitive landscape, particularly with respect to new products and price cuts being offered by Tableau competitors. In response, Defendant Walker stated, in relevant part:

[O]verall, the products you've just mentioned, they're relatively new. The Qlik product or the Microsoft change, that's all relatively new. So, we haven't seen a lot with that.

***I wouldn't think that the overall landscape of competition has changed drastically over the last two years that we've been public***. The interesting thing about us is that the market opportunity as we see it, we don't see it as just the traditional BI market opportunity. We do think about Excel or Power users, knowledge workers.

And it's not a rip and replace on Excel at all, because I think we're extremely complementary to Excel and Access and SQL server and [MSAS] and all that. So, those are all data sources to us that we connect to. So, we're very complementary to people who have to have analytics using those.

But then, there's this greenfield space, which is people who don't know what BI is, have no idea what it stands for, aren't really into analytics, but they have some data and they have questions and they really do want to better themselves. And so, in any given period, in any quarter, we're selling to all three of those buckets, and we're addressing that market, which is a lot different than the competitors are. A lot of the competition had to do with the traditional BI because it was the more established market. But we think about the other 80% of the organization that has needs around analytics, that are being disenfranchised. And so, we're trying to go after both, all the time.

***So, that's why I say the dynamic hasn't changed too much, but we're always vigilant around that***. We're small in relative size to one of those companies you mentioned. And so, we continue to do that.

(Emphasis added.)

### *February 27, 2015 10-K*

118.    On February 27, 2015, the Company filed its Form 10-K with the SEC for the fiscal year ended December 31, 2014 (the "2014 10-K"). The 2014 10-K was signed by Defendants Chabot, Walker, Hanrahan, Stolte, Baskett, Seawell, Jurgensen, and McAdam, and non-party Scott Sandell.

119.    The 2014 10-K misleadingly characterized then existing risks related to generating incremental license revenue from existing customers as potential risks, stating, in relevant part:

Our future growth also depends upon expanding sales of our products to and renewing license and maintenance agreements with existing customers and their organizations. ***If our customers do not purchase additional licenses or capabilities, our revenues may grow more slowly than expected,*** may not grow at all or may decline. Additionally, increasing incremental sales to our current customer base requires increasingly sophisticated and costly sales efforts that are targeted at senior management. There can be no assurance that our efforts would result in increased sales to existing customers ("upsells"), and additional revenues. If our efforts to upsell to our customers are not successful, our business would suffer.

* * *

*If our customers do not renew their agreements* with us, or renew on terms less favorable to us, our revenues may decline.

* * *

*If our sales cycle were to lengthen* . . . *events may occur* during this period that affect the size or timing of a purchase or even cause cancellations, *which may lead to greater unpredictability* in our business and results of operations.

(Emphasis added.)

120.    The 2014 10-K also contained an MD&A section. In that section, the Individual Defendants failed to disclose that the events and uncertainties known to management at the time were having, and were reasonably likely to continue to have, a material effect on the Company's operating results. These included the uncertainties associated with the introduction of new, competing products by established competitors at price points below Tableau's.

121.    The 2014 10-K further stated, regarding the Company's disclosure controls, which were defective at the time, that:

**ITEM 9A.    CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our principal executive officer and principal financial officer, our management conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of December 31, 2014, the end of the period covered by this report.

In designing and evaluating our disclosure controls and procedures, management recognizes that any disclosure controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

*Based on management's evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures are* designed to, and are *effective* to, provide assurance at a reasonable level that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time

periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures.

(Emphasis added.)

122.    Attached to the 2014 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX Certifications") signed by Defendants Chabot and Walker, attesting to the accuracy of the 2014 10-K.

### *Morgan Stanley Technology, Media, & Telecom Conference*

123.    On March 2, 2015, Tableau participated in the Morgan Stanley Technology, Media, & Telecom Conference. In response to a question about the Company's market penetration, Defendant Walker responded by stating, in relevant part:

And so, overall, *we think it's early innings*. We think there's still a tremendous amount to do, not only reaching all those customers but also from a product innovation standpoint. You know we're very, very rich in product innovation, and we want to continue doing that.

In all the world, I can only think of one customer that's 100% penetrated, and that's Tableau. Everybody at Tableau uses the product in every discipline across the organization.

All of our customers that we have – we have 26,000, again, that we're proud of. But *there's ample opportunity to bring analytics to much many more people inside those organizations*. And so, *we don't feel very penetrated in any of our existing opportunities*.

And 26,000 out of – I think VMware has got over 0.5 million accounts. *We've got a long way to go to reach a lot more people and companies*.

(Emphasis added.)

124.    At the conference, Defendant Walker described Tableau's new competition as a "net positive" for the Company, stating that, "with respect to other people coming in and bringing awareness to it, overall that's a net positive, because you use Salesforce or Tableau all the time."

125.    In response to a question from the conference's host about the effects of Qlik's and Microsoft's offerings on Tableau's business, Defendant Walker derided those offerings as overly complex and technical, asserting that they had had little effect on Tableau. Defendant Walker stated, in relevant part:

> ***I don't think that it has changed much in the overall ecosystem.*** I think Qlik and other data discovery vendors are seeing the greenfield opportunity of bringing analytics to that other part of the market that's not just traditional BI.
>
> It's not to say we can't help the traditional BI crowd, but it's really that expansive use cases outside of that is what I think they're seeing and other vendors are seeing as an opportunity, because there are a lot of people who want to unleash the power of data. ***And they're not able to do so, because the tools are too complicated or too technical and they're all gated behind some type of technical project. And that's what we're trying to get away from and empower people***.

(Emphasis added.)

126.    At the conference, Defendant Walker misleadingly stated the following regarding Microsoft's new product offering:

> Overall, it's Microsoft. So, you always want to take it seriously and that type of thing, but we think of Microsoft as a data provider, quite frankly: MSAS; SQL Server; Power Pivot, which they did a few years ago. ***Those are all data sources to us. And so, we continue to complement where people are storing their data***.
>
> Excel, I use Excel every day. ***Tableau is not a rip and replace on Excel. We're a supercharger of the data in Excel***, because a lot of people in the world have got databases or data sources all over. And all they do is extract out into Excel. And then, they try and start their analytic experience. ***And so, what we're able to do is super charge that. And so, I think we'll continue to do that***.

(Emphasis added.)

***Pacific Crest Emerging Technology Summit***

127.    Tableau participated in the Pacific Crest 10th Annual Emerging Technology Summit on March 3, 2015. Defendant Walker stated during the conference that the Company's market opportunity was "much broader" than the $13-$15 billion business intelligence market. In

response to a query about competition, Defendant Walker reassured those in attendance, stating, in relevant part:

> *I don't think that environment has changed drastically, overall*. And so, there is competition. There are people who are working . . . But from an overall traditional standpoint, *there is not a change in the guard or anything like that*. I think it's going. It think there's a lot of emerging technologies that are out there. But just like we are always, we're looking to complement data. So, if people are doing neat things, we want to connect to it.

(Emphasis added.)

128.    In response to a question regarding competition from Salesforce or Microsoft, Defendant Walker again referred to competition as a "net positive," stating, in relevant part:

> And so, hey, there's a lot of awareness on analytics and ease of use analytics, which is positive for everybody, I think, because people are starting to expect they're able to use something easy and get answers to their questions. And so, *overall, I think it's a net positive to have that awareness*.

(Emphasis added.)

### JMP Technology Conference

129.    Also on March 3, 2015, the Company participated in the JMP Technology Conference. Defendant Walker summarized the competitive landscape, stating: "from a competitive landscape, since we've been public – in May, it will be two years – I don't think it's changed drastically. . . . I wouldn't call out anybody or any change in trends over the last two years."

### May 7, 2015 Press Release

130.    On May 7, 2015, the Company issued a press release titled "Tableau Announces Strong First Quarter 2015 Results," announcing its financial results for the quarter ended March 31, 2015. The press release noted the following highlights of the quarter, and quoted Defendant Chabot commenting on the results, stating, in pertinent part:

- Total revenue grew to $130.1 million, up 75% year over year.

- License revenue grew to $84.4 million, up 74% year over year.

\* \* \*

"Tableau's first quarter 2015 results were strong and demonstrate that the demand for Tableau continues to grow," said Christian Chabot , Chief Executive Officer of Tableau Software. "Tableau's ability to help people achieve more with data is resulting in an ever growing customer base. During the quarter, we added more than 2,600 new customer accounts, bringing the total to more than 29,000 worldwide."

***May 8, 2015 Form 10-Q***

131.    The Company filed a quarterly report on Form 10-Q with the SEC on May 8, 2015

(the "Q1 2015 10-Q") for the first quarter ended March 31, 2015, signed by Defendant Walker.

132.    The Q1 2015 10-Q misleadingly characterized then existing risks related to

generating incremental license revenue from existing customers as potential risks, stating, in

relevant part:

> Our future growth also depends upon expanding sales of our products to and renewing license and maintenance agreements with existing customers and their organizations. ***If our customers do not purchase additional licenses or capabilities, our revenues may grow more slowly than expected,*** may not grow at all or may decline. Additionally, increasing incremental sales to our current customer base requires increasingly sophisticated and costly sales efforts that are targeted at senior management. There can be no assurance that our efforts would result in increased sales to existing customers ("upsells"), and additional revenues. If our efforts to upsell to our customers are not successful, our business would suffer.
>
> * * *
>
> ***If our customers do not renew their agreements*** with us, or renew on terms less favorable to us, our revenues may decline.
>
> * * *
>
> ***If our sales cycle were to lengthen*** . . . ***events may occur*** during this period that affect the size or timing of a purchase or even cause cancellations, ***which may lead to greater unpredictability*** in our business and results of operations.

(Emphasis added.)

133.     The Q1 2015 10-Q also contained an MD&A disclosure, in which the Individual Defendants failed to disclose that the events and uncertainties known to management at the time were having, and were reasonably likely to continue to have, a material effect on the Company's operating results. These included the uncertainties associated with the introduction of new, competing products by established competitors at price points below Tableau's.

134.     The Q1 2015 10-Q further stated, regarding the Company's disclosure controls, that:

**ITEM 4. CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our principal executive officer and principal financial officer, our management conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of the end of the period covered by this report.

In designing and evaluating our disclosure controls and procedures, management recognizes that any disclosure controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based on management's evaluation, our principal executive officer and principal financial officer concluded that our disclosure controls and procedures are designed to, and are effective to, provide assurance at a reasonable level that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures.

135.     Attached to the Q1 2015 10-Q were SOX Certifications signed by Defendants Chabot and Walker, attesting to the accuracy of the Q1 2015 10-Q.

***Bank of America Merrill Lynch 2015 Global Technology Conference***

136.    On June 2, 2015, the Company presented at the Bank of America Merrill Lynch

2015 Global Technology Conference. In response to an inquiry about market penetration,

Defendant Walker responded that the $13-$17 billion traditional BI market was "fertile ground,"

and asserted the Company had a "long way to go" vis-à-vis overall market penetration.

137.    At the conference, Defendant Walker was asked about market penetration into the

installed base for Tableau Server. In response, Defendant Walker stated, in relevant part: "[W]e

don't feel like we're very penetrated in any of those accounts with respect to the tapping out of an

opportunity within a customer base."

138.    During the conference, Defendant Walker commented regarding recent product

introductions by Salesforce and Qlik, stating, in relevant part:

> *Not much on the overall competitive spectrum*. I would also highlight is, it's a
> pretty vast opportunity. It's bigger than just the traditional BI. It's reaching a lot
> more users with different use cases and functional areas. It is what we're doing, so
> *it's not like a knife battle on every type of corner*, if you will.

(Emphasis added.)


### July 29, 2015 Press Release and Conference Call

139.    On July 29, 2015, the Company issued a press release titled "Tableau Reports

Second Quarter 2015 Financial Results." The press release noted the following highlights of the

quarter ended June 30, 2015, and quoted Defendant Chabot commenting on the results, stating, in

pertinent part:

- Total revenue grew to $149.9 million, up 65% year over year.
- License revenue grew to $96.7 million, up 60% year over year.

* * *

"Tableau executed another strong quarter as we continue to acquire new customers,
expand relationships with existing customers, grow internationally and rapidly
innovate," said Christian Chabot, Chief Executive Officer of Tableau Software.
"We are seeing a strong demand for Tableau's products resulting in record

customer growth and product adoption. During the quarter we added more than 3,000 new customer accounts, bringing the total to more than 32,000 worldwide."

140.    Also on July 29, 2015, the Company held a conference call with analysts and investors. In response to a question about the Company's competitive landscape, Defendant Chabot explained that, although the overall competitive landscape "fluctuates" and that there were "a lot of dimensions to the competitive landscape in this industry," "*we haven't seen a change in the competitive landscape in this last quarter*."  (Emphasis added.)

141.    During the call, in response to a question about competition from Microsoft, Defendant Chabot once again asserted that the competitive landscape had not changed, stating, in relevant part:

> Microsoft has been a fierce competitor of Tableau really since the beginning, even since the earliest days of the Company. And as they've tried to find their way with their BI strategy, the competitive dynamic has changed here and there, ebbs and flows as they rev their releases.
>
> ***They did just put a new product out on the market, or at least are about to***, in the case of power BI. ***And again, I guess the best news I can report at this point is that we haven't seen a change in the competitive dynamic***.
>
> * * *
>
> [Our] constellation of three or four pillars continue to be the competitive juggernaut for Tableau. ***And the recent news from our competitors haven't changed that. But we'll certainly keep in touch on the issue***.

(Emphasis added.)

***August 7, 2015 Form 10-Q***

142.    The Company filed a quarterly report on Form 10-Q with the SEC on August 7, 2015 (the "Q2 2015 10-Q") for the quarter ended June 30, 2015, signed by Defendant Walker.

143.    The Q2 2015 10-Q misleadingly characterized then existing risks related to generating incremental license revenue from existing customers as potential risks, stating, in relevant part:

Our future growth also depends upon expanding sales of our products to and renewing license and maintenance agreements with existing customers and their organizations. ***If our customers do not purchase additional licenses or capabilities, our revenues may grow more slowly than expected,*** may not grow at all or may decline. Additionally, increasing incremental sales to our current customer base requires increasingly sophisticated and costly sales efforts that are targeted at senior management. There can be no assurance that our efforts would result in increased sales to existing customers ("upsells"), and additional revenues. If our efforts to upsell to our customers are not successful, our business would suffer.

\* \* \*

***If our customers do not renew their agreements*** with us, or renew on terms less favorable to us, our revenues may decline.

\* \* \*

***If our sales cycle were to lengthen*** . . . ***events may occur*** during this period that affect the size or timing of a purchase or even cause cancellations, ***which may lead to greater unpredictability*** in our business and results of operations.

(Emphasis added.)

144.    The Q2 2015 10-Q also contained an MD&A disclosure, in which the Individual Defendants failed to disclose that the events and uncertainties known to management at the time were having, and were reasonably likely to continue to have, a material effect on the Company's operating results. The failure to disclose included the uncertainties associated with the introduction of new, competing products by established competitors at price points below Tableau's.

145.    The Q2 2015 10-Q further stated, regarding the Company's disclosure controls, that:

**ITEM 4. CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our principal executive officer and principal financial officer, our management conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of the end of the period covered by this report.

In designing and evaluating our disclosure controls and procedures, management recognizes that any disclosure controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based on management's evaluation, *our principal executive officer and principal financial officer concluded that our disclosure controls and procedures are* designed to, and are *effective* to, provide assurance at a reasonable level that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures.

(Emphasis added.)

146.    Attached to the Q2 2015 10-Q were SOX Certifications signed by Defendants Chabot and Walker, attesting to the accuracy of the Q2 2015 10-Q.

### *Pacific Crest 17th Annual Global Technology Leadership Forum*

147.    The Company participated in the 17th Annual Pacific Crest Global Technology Leadership Forum on August 10, 2015. During the forum, Defendant Ajenstat commented that, despite many other companies entering the space occupied by Tableau, such efforts had not been successful at challenging Tableau. Defendant Ajenstat stated, in relevant part:

First off, I've been in this space for 15 years and this is probably the most exciting time to be in the analytics industry, there is so much innovation, so many different companies coming up with new and exciting capabilities that will help customers all over the world. *What's been really interesting in the past year is how the mega vendors, the Microsofts and SAPs of the world have really come about in this space*. That strategy for them hasn't necessarily - it's not a new thing. We've been doing the same playbook for the last four years, whether it's Microsoft every single year, *Microsoft has come up with a new Tableau like capability first it was PowerPivot, then it with Power View, then it with Power Map, then it was something else and none of those has really caught on*. *SAP has done the same thing providing free Tableau like capabilities directly in the products. Cognos has done same thing, MicroStrategy has done the same thing.* And I bring those up because *the way that they're trying to compete* is by connecting back to their stack

and reiterating the old ways that ***has not worked*** and why people are looking at alternatives like Tableau.

(Emphasis added.)

### Citi Global Technology Conference

148.    The Company presented at the Citi Global Technology Conference on September 10, 2015. In response to a query about the competitive landscape, Defendant Peir downplayed the existence of competitive threats, stating, in relevant part:

> So, from a competitive standpoint**, *I think we can continue growing even as other companies are successful in this space*****. We see still for – because of our land and expand model, generally we either don't see competition because we've been successful in part of the Company. And we're expanding to other areas.

> Or it's the traditional BI is the alternative. So, the – ***from a competitive standpoint***, ha– ***we haven't really seen the landscape change that materially*** from traditional BI, your first category. The second one, I think ***Qlik and other – TIPCO, we see less so in the market than a few years ago***. But I think Qlik has been growing – has had healthy growth and had innovated on their products.

(Emphasis added.)

149.    Defendant Peir continued, discussing competition in cloud analytics, stating, in relevant part:

> Regards to Salesforce and the cloud analytics competitors*, **largely not seeing them in our deals of yet***. I think with Salesforce in particular, they're in their use case. Where – what we're finding with our customers is one, their data isn't just in the cloud. But it's in the various repositories as we talked about.

> But at least in our deals, and there's a quarterly competitive dashboard. ***Haven't seen Salesforce really materialize*** on that as a – and then Microsoft, we're also Seattle-based company, have seen their various generations. I guess would – we've downloaded Microsoft Power BI. And there's – I'd say it would be easy charting capabilities. ***But the rich analytic experience and the power of our products is still a big difference with Microsoft***.

(Emphasis added.)

### Deutsche Bank Technology Conference

150.   On September 16, 2015, the Company participated in the Deutsche Bank Technology Conference. An analyst asked about competition from Salesforce, to which Defendant Walker responded that such competition had not yet hit the Company's radar. The following exchange took place during the conference:

**Analyst**:

So, ***Salesforce updated its analytics cloud with a new version 2***. And yesterday they spent some time talking about the data visualization capabilities, et cetera. . . . ***Has that even hit the radar of Tableau and your reps yet when they're out closing business***?

**Defendant Walker**:

***No. Not so much***. I mean it was released last year. I think they were pricing it more towards their top-end customers.

(Emphasis added.)

151.   The following exchange took place with Defendant Walker regarding competition from Microsoft:

**Analyst**:

Let's talk a little bit about ***Microsoft***. They're another big vendor that has a little bit of Tableau envy, and ***are coming out with updated cloud-based cheap Power BI tools to try to wedge their way into the space. Is that one hitting the radar***?

**Defendant Walker**:

Yes. And so again, product release year. So, it's definitely one of the things that I would think—even Gartner I think put out a thing on that last month. ***Without a doubt, people will consider it***. Because it's part of their ELAs. And so, this is the first time that they've broken it away from Excel. Traditionally their analytics have all been embedded in Excel.

\* \* \*

And it's basically – it's dashboarding. ***It's creating a dashboard. So, it's got a good dashboard creation. And that's where it stops. It's not going to necessarily go deeper***. That doesn't mean they will not continue to innovate on it. But in a bake-off with Tableau, ***you can do a lot more with Tableau than you could with that product***. And so, I think that's our approach. And that's why we'll continue to innovate and make it better. But you've always got to be aware and concerned of

50

the competitive pressures, especially with somebody who spends more on marketing than we have in revenue.

(Emphasis added.)

### *November 5, 2015 Press Release and Conference Call*

152.    On November 5, 2015, the Company issued a press release titled "Tableau Reports Third Quarter 2015 Financial Results." The press release noted the following highlights of the quarter ended September 30, 2015, and quoted Defendant Chabot's comments on the results, stating, in pertinent part:

- Total revenue grew to $170.8 million, up 64% year over year.
- License revenue grew to $109.5 million, up 57% year over year.

* * *

"I am very pleased with Tableau's performance this quarter. We continue to demonstrate solid business growth as more customers embrace the Tableau way of analytics with great enthusiasm and success," said Christian Chabot, Chief Executive Officer of Tableau Software. "As a result, we had another record quarter of new customer wins. More than 3,100 new customer accounts were added in Q3, bringing the total to more than 35,000 worldwide."

153.    Later that same day, the Company held a conference call with analysts and investors. During the call, a question was posed regarding the effect of new product introductions on the competitive landscape. In response, Defendant Chabot dismissed the significance of competitive threats, stating, in relevant part:

We believe ***the forward situation will be similar to the historical ones***, ***which is many of those tools*** will be able to carve out some niche and be able to achieve some level of success with customers, but ***will not fundamentally change the dynamics of competition in business analytics platforms***.

* * *

Although there has been more noise [i.e. competition], as you mentioned with regard to offerings of that profile, I'll close where I began, ***which is we don't see it fundamentally changing the competitive dynamic for Tableau***.

(Emphasis added.)

154.    During the call, a participant asked if customers would "kick the tires" on newly released products competing with Tableau, and if the new releases had extended the Company's sales cycle. In response, Defendant Chabot stated:

> **The short answer is no**, in the sense that when there are new products available to customers, generally speaking, they don't increase the number of things they're looking at. **They just change the mix of the ones they are choosing to look at**.
>
> * * *
>
> **We haven't seen a significant change there. I would add, at this point, I don't predict one**. Again, for the same reason, which is I think those competitive changes are largely about changing the mix of who's being considered as opposed to fundamentally changing the way customers are evaluating product.

(Emphasis added.)

### November 9, 2015 Form 10-Q

155.    The Company filed a quarterly report on Form 10-Q with the SEC on November 9, 2015 (the "Q3 2015 10-Q") for the quarter ended September 30, 2015, signed by Defendant Walker.

156.    The Q3 2015 10-Q misleadingly characterized then existing risks related to generating incremental license revenue from existing customers as potential risks, stating, in relevant part:

> Our future growth also depends upon expanding sales of our products to and renewing license and maintenance agreements with existing customers and their organizations. **If our customers do not purchase additional licenses or capabilities, our revenues may grow more slowly than expected,** may not grow at all or may decline. Additionally, increasing incremental sales to our current customer base requires increasingly sophisticated and costly sales efforts that are targeted at senior management. There can be no assurance that our efforts would result in increased sales to existing customers ("upsells"), and additional revenues. If our efforts to upsell to our customers are not successful, our business would suffer.
>
> * * *

> ***If our customers do not renew their agreements*** with us, or renew on terms less favorable to us, our revenues may decline.
>
> * * *
>
> ***If our sales cycle were to lengthen*** . . . ***events may occur*** during this period that affect the size or timing of a purchase or even cause cancellations, ***which may lead to greater unpredictability*** in our business and results of operations.

(Emphasis added.)

157.    The Q3 2015 10-Q also contained an MD&A disclosure, in which the Individual Defendants failed to disclose that the events and uncertainties known to management at the time were having, and were reasonably likely to continue to have, a material effect on the Company's operating results. These included the uncertainties associated with the introduction of new, competing products by established competitors at price points below Tableau's.

158.    The Q3 2015 10-Q further stated, regarding the Company's disclosure controls, that:

**ITEM 4. CONTROLS AND PROCEDURES**

**Evaluation of Disclosure Controls and Procedures**

Under the supervision and with the participation of our principal executive officer and principal financial officer, our management conducted an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act, as of the end of the period covered by this report.

In designing and evaluating our disclosure controls and procedures, management recognizes that any disclosure controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives. In addition, the design of disclosure controls and procedures must reflect the fact that there are resource constraints and that management is required to apply its judgment in evaluating the benefits of possible controls and procedures relative to their costs.

Based on management's evaluation, ***our principal executive officer and principal financial officer concluded that our disclosure controls and procedures are*** designed to, and are ***effective*** to, provide assurance at a reasonable level that the information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time

periods specified in Securities and Exchange Commission rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosures.

(Emphasis added.)

159.   Attached to the Q3 2015 10-Q were SOX Certifications signed by Defendants Chabot and Walker, attesting to the accuracy of the Q3 2015 10-Q.

### UBS Global Technology Conference

160.   The Company participated in the UBS Global Technology Conference on November 17, 2015. In response to a question about competition from MicroStrategy and Microsoft, Defendant Chabot stated, in pertinent part, as follows:

> ***MicroStrategy hasn't been a competitor – a major competitor factor for us for many years***. Their offerings to try to compete with Tableau remain fairly tied into their own little proprietary ecosystem that isn't growing very fast. In fact, I think it's shrinking. And so, we just – we don't have much to say about it. We don't – ***it's not a big competitive concern for us.***

> ***Microsoft***, of course, is. They are a fierce competitor and a good company. We are Seattle-based. I mean, seemingly half of our people are married to people who work at Microsoft. We take them seriously. People write off Microsoft, we're not that way at all. We're a Seattle company, this never occurred to you. And we can be – we've been competing with them since the day I founded the Company. Our first office space was a bedroom in Capitol Hill in Seattle, a few miles away from Microsoft. So, they've always been a competitor to us.

> ***And luckily, they have spent most of that decade fumbling around,*** by the way they would tell you that, I'm not trying to – I mean, they had what was it, the Point of service and then performance point, and then some share point integration play with their BI solution and then they went to Power Query and then, oops we didn't mean that, we meant Power BI and then literally your mind spins trying to keep track of their BI strategy. I'll be more pointed in just bring you up to date. So, that's just been the general up to date and people other than me will tell you that it's just sort of the way they have behaved for the last decade. ***The customers are just left reeling and confused, and their BI products are not loved as a result***.

(Emphasis added.)

161.    The statements referenced in ¶¶ 112-160 above were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) new, aggressively-priced software introduced by competitors was causing Tableau's customers to delay and cancel pending license orders; (2) competitive products were lengthening Tableau's sales cycle and decelerating its growth rate; (3) statements about competition having little or no adverse effect on the Company's business understated and misrepresented the effects of competition on Tableau; (4) based on the foregoing, the Individual Defendants lacked a reasonable basis for positive statements about the Company's future growth prospects; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Begins to Emerge**

162.    On January 7, 2016, the Company unexpectedly disclosed that its Executive Vice President of Sales, Kelly Wright, would be leaving Tableau by the end of the year. This sudden personnel change signaled the instability in Tableau's sales operations.

163.    After markets closed on February 4, 2016, Tableau issued a press release announcing its financial results for the quarter and year ended December 31, 2015. The press release provided a summary of the fiscal year and quarter, stating, in relevant part:

Fourth Quarter 2015 Financial Results:

- ***Total revenue grew to $202.8 million, up 42% year over year.***
- ***License revenue grew to $133.1 million, up 31% year over year.***
- International revenue grew to $53.7 million, up 63% year over year.
- Added more than 3,600 new customer accounts.
- Closed 414 transactions greater than $100,000, up 36% year over year.
- Diluted GAAP net loss per share was $0.57; diluted non-GAAP net income per share was $0.33.

- ***Recognized a valuation allowance on deferred income tax assets of $46.7 million.***

Fiscal Year 2015 Financial Results:

- ***Total revenue grew to $653.6 million, up 58% year over year.***
- ***License revenue grew to $423.8 million, up 51% year over year.***
- International revenue grew to $164.3 million, up 75% year over year.
- Added more than 12,500 new customer accounts.
- Closed 1,192 transactions greater than $100,000, up 53% year over year.
- Diluted GAAP net loss per share was $1.17; diluted non-GAAP net income per share was $0.62.

(Emphasis added in bold & italics.)

164. Regarding the valuation allowance on deferred income tax assets, the press release stated: "We believe that it is more likely than not that the benefit from our U.S. federal and state deferred tax assets will not be realized."

165. Under applicable accounting rules, a tax valuation allowance is recorded when a company expects that it will not be able to realize the benefits of deferred tax assets, primarily due to a lack of sufficient expected future profits. By recording a tax valuation allowance, Tableau was informing the marketplace that the Company believed it to be unlikely that it would be able to generate sufficient future income to realize the benefits of its deferred tax assets.

166. Also on February 4, 2016, following the issuance of the press release, the Company held a conference call with analysts and investors. During the call, Defendant Walker attempted to attribute weakness in Tableau's financial results to macroeconomic factors, asserting that "we saw some softness in spending, especially in North America."

167. However, Defendant Chabot admitted that competition was adversely impacting the Company's business, stating, in relevant part:

Over the years, ***the competitive dynamic has become more crowded and difficult.*** Tableau and a few other companies have pioneered this new way of visual analytics that I described earlier. And a lot of people caught gotten notice. So, ***there are more***

56

*and more companies with offerings in the arena. So, it has gotten thicker and thicker over the years, so to speak*.

(Emphasis added.)

168.     The announcement that Tableau was recognizing a valuation allowance on deferred income tax assets, combined with the Company's disclosure that it expected the Company's 2016 first quarter revenue growth rate to decline to approximately 25% on a year-over-year basis to $160-165 million (down from revenue growth rates of 75%, 65%, 64% and 42% during the first, second, third and fourth quarters of 2015, respectively), revealed that aggressively priced offerings by competitors were having a materially adverse effect on Tableau's business.

169.     On this news, the price of Tableau stock dropped $40.42 per share, or nearly 50%, from the previous day's closing price of $81.75 per share, to close at $41.33 per share on February 5, 2016.

170.     The price of Tableau stock continued to drop, falling an additional 9.9% and closing at $37.22 on February 8, 2016, the next trading day following February 5, 2016.

171.     Securities analysts also cut their price targets on Tableau's common stock, issuing reports that noted, *inter alia*, Tableau's "big growth deceleration;" a "specter of increasing competition and potential saturation in Tableau's customer base;" and that analysts were "not convinced" the Company's significant growth deceleration was due to macroeconomic factors.

### The Merger

172.     Years later, on June 9, 2019, Tableau entered into the Merger Agreement with Salesforce and Sausalito Acquisition Corp. Pursuant to the Merger Agreement, Salesforce would acquire all outstanding shares of Tableau stock, and would exchange each acquired share of Tableau stock for 1.103 shares of Salesforce stock.

173.    The Merger was completed on August 1, 2019, on which date Salesforce acquired all of the outstanding capital stock of Tableau, and Tableau became a wholly-owned subsidiary of Salesforce.

174.    That same day, in connection with the Merger, each member of Tableau's Board resigned, except for non-party Selipsky, who remained as Tableau's CEO.

175.    Subsequently, on August 12, 2019, Tableau's stock ceased trading on the NYSE.

## DAMAGES TO TABLEAU

176.    As a direct and proximate result of the Individual Defendants' conduct, Tableau is losing and expending many millions of dollars.

177.    Such expenditures include, but are not limited to, legal fees associated with the Securities Class Action filed against Tableau, its former CEO, its former CFO, its former Chief Development Officer, and its former Chief Scientist, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

178.    Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

179.    As a direct and proximate result of the Individual Defendants' conduct, Tableau has also suffered and will continue to suffer a loss of reputation and goodwill that will plague the Company in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

180.    Plaintiff brings this action derivatively and for the benefit of Tableau and Salesforce to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches

of their fiduciary duties as directors, officers, and controlling shareholders of Tableau, unjust enrichment, as well as the aiding and abetting thereof.

181.    Tableau and Salesforce are named solely as nominal parties in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

182.    Plaintiff is a Salesforce shareholder, and he has been a Salesforce shareholder continuously since the Merger. Prior to the Merger, and at all relevant times, Plaintiff was continuously a shareholder of Tableau. Plaintiff will adequately and fairly represent the interests of Tableau and Salesforce in enforcing and prosecuting their rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

183.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

184.    A pre-suit demand on the Board of Salesforce is futile and, therefore, excused. At the time of filing of this action, the Parent Board consists of the following 11 individuals: non-parties Marc Benioff, Parker Harris, Craig Conway, Alan Hassenfeld, Neelie Kroes, Colin Powell, Sanford Robertson, John V. Roos, Robin Washington, Maynard Webb, and Susan Wojcicki (the "Directors"). Plaintiff needs only to allege demand futility as to six of the eleven directors that were on the Parent Board at the time this action was commenced.

185.    Demand is excused as to all of the Directors because each one of them, acting collectively, caused Salesforce to acquire Tableau at an unfairly low price because of the substantial damage the Individual Defendants had inflicted on Tableau, which renders the Directors unable to impartially investigate the charges and decide whether to pursue action against the Individual Defendants or any other perpetrators of the scheme described herein.

186.    Demand is further excused as to all of the Directors because each of the Directors approved an indemnification provision in the Merger Agreement immunizing all of the Individual Defendants from liability in connection with the scheme described herein. Pursuant to Section 7.4 of the Merger Agreement, the Individual Defendants, along with all other current and former officers, directors and employees of the Company will be indemnified and held harmless "against any costs or expenses . . .  judgments, fines, losses, claims, damages, liabilities and amounts paid in settlement in connection with any actual or threatened claim, action, investigation, suit or proceeding in respect of acts or omissions occurring or alleged to have occurred at or prior to the Effective Time." The Merger Agreement defines the "Effective Time" as the date and time at which the Merger became effective.

187.    Accordingly, under the Merger Agreement, the Individual Defendants cannot be held liable for any of their intentional or reckless misconduct alleged herein.  In other words, the Individual Defendants will receive home-free tickets. Thus, in exchange for obtaining Tableau at a discounted price, the Directors engaged in a scheme to protect the Individual Defendants from liability in connection with the misconduct discussed herein and therefore, are incapable of considering a demand against the Individual Defendants with disinterestedness.

188.    Given the Individual Defendants' complete absolution of any wrongdoing in the face of so much wrongdoing as alleged herein, Section 7.4 of the Merger Agreement evidences that the Merger Agreement was entered into in bad faith and to deprive the Company of its claims against the Individual Defendants.

189.    Indeed, the terms of the Merger Agreement favored the Individual Defendants at the expense of the Company's own shareholders, so much so that three lawsuits were brought against the Company and certain of the Individual Defendants by shareholders of the Company

challenging the adequacy of the merger consideration as undervaluing the Company in July 2019.[12] The Directors chose to resolve these claims by way of settlement in the fiscal quarter ended October 31, 2019.

190.   Additional reasons that demand on the Board is futile follow.

191.   Tableau has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Directors have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for Tableau any part of the damages Tableau suffered and will continue to suffer thereby. Thus, any demand upon the Directors would be futile.

192.   The acts complained of herein constitute violations of fiduciary duties owed by Tableau's officers and directors, and these acts are incapable of ratification.

193.   Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least six of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Parent Board is excused as futile.

## FIRST CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

194.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

195.   Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Tableau's business and affairs.

---

[12] These actions are captioned *O'Brien v. Tableau Software, Inc. et al*, Case No. 1:19-CV-06447, filed in the United States District Court for the Southern District of New York; *Stein v. Tableau Software, Inc. et al*, Case No. 1:19-CV-01289, and *Curtis v. Tableau Software, Inc. et al*, 1:19-CV-01290; both filed in the United States District Court for the District of Delaware. All three actions were dismissed in August 2019.

196.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

197.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Tableau.

198.    In breach of their fiduciary duties owed to Tableau, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose that: (1) new, aggressively-priced software introduced by competitors was causing Tableau's customers to delay and cancel pending license orders; (2) competitive products were lengthening Tableau's sales cycle and decelerating its growth rate; (3) statements about competition having little or no adverse effect on the Company's business understated and misrepresented the effects of competition on Tableau; (4) based on the foregoing, the Individual Defendants lacked a reasonable basis for positive statements about the Company's future growth prospects; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

199.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

200.    In further breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

201.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Tableau's securities and disguising insider sales.

202.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Tableau's securities and engaging in insider sales.

203.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

204.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Tableau has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

205.    Plaintiff on behalf of Tableau and Salesforce has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Unjust Enrichment

206.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

207.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Tableau.

208.    The Individual Defendants received bonuses, stock options, or similar compensation from Tableau that was tied to the performance or artificially inflated valuation of Tableau, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

209.    Plaintiff, as a shareholder and a representative of Tableau, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, excessive compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

210.    Plaintiff on behalf of Tableau and Salesforce has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)     Declaring that Plaintiff may maintain this action on behalf of Tableau and Salesforce, and that Plaintiff is an adequate representative of Tableau and Salesforce;

(b)     Declaring that each of the Individual Defendants breached or aided and abetted the breach of their fiduciary duties to Tableau;

(c)     Determining and awarding to Tableau the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing Tableau and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Tableau from a repeat of the damaging events described herein, including, but not limited to, the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the supervision of the Company's operations; and

2. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Tableau restitution from each of the Individual Defendants;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

Dated: April 2, 2020

Of Counsel:


**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com

Respectfully submitted,

**FARNAN LLP**

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
Email: bfarnan@farnanlaw.com
Email: mfarnan@farnanlaw.com

*Attorneys for Plaintiff*